[Sac. No. 5179. In Bank.—April 22, 1938.]

CALIFORNIA CANNING PEACH GROWERS (a Nonprofit Cooperative Association), Appellant, v. E. R. WILLIAMS et al., Respondents.

222

Agnew & Boekel, Carroll Single and Stanley J. Cook for Appellant.

Richard .W. Young, Floyd B. Cerini and F. X. Kerner, as *Amici Curiae,* on Behalf of Appellant.

Hadsell, Sweet, Ingalls & Lamb, Vernon F. Gant and Brown & Rosson for Respondents.

THE COURT.—This action was commenced by the association against E. R. and Frances O. Williams, husband and wife, on two common counts, the first alleging that between designated dates the plaintiff at the special instance and request of defendants furnished, paid, and laid out to and for the use and benefit of the defendants a designated sum of money which defendants agreed to repay with interest; and the second alleging the same indebtedness due from the defendants to plaintiff on an open and current book account. Defendants answered denying the allegations of the complaint, and defendant E. R. Williams likewise filed a counterclaim and cross-complaint. The issues raised by this last named pleading are not involved on this appeal.

On the trial it developed that the action was in fact one by the association to recover back from defendants certain alleged overpayments made to Mr. Williams for his peaches grown in 1934 on the Merci ranch in Stanislaus County. It is important to note that the present action involves only the Merci ranch, and only the season 1934, for the reason that there is another action here pending in which the Williams are defendants, together with A. D. Poggetto, and in which not only the Merci ranch for 1934 but also several other ranches and other seasons are involved. (*California*

*Canning Peach Growers* v. *Poggetto and Williams,* S. F. 15906, *post,* p. 233 [78 Pac. (2d) 1161].)

At the trial it developed that the association had purchased the Williams' fruit for 1934 from the Merci ranch and had paid for it on a renter member basis—market price less 25c per ton. The theory of appellant association is that the only contract Williams had with the association for that year was a regular marketing agreement calling for the pooled price less 5 per cent and expenses and that he was overpaid the amount that it seeks to recover in this action. The arithmetic of the controversy is not in dispute. It was stipulated that, if defendant E. R. Williams was entitled to be paid as a renter member, he had been overpaid the sum of $461.28, but if he should have been paid as were owner members he had been overpaid in the sum of $2,716.27. The sum of $461.28 was for fertilizer purchased by Williams from the association which the association failed to deduct from his 1934 payments, and which Williams admits he owes. The trial court determined that no cause of action at all had been proved against Mrs. Williams, and that as to Mr. Williams he was legally entitled to payment as a renter member. Accordingly, judgment was entered in Mrs. Williams' favor, and against Mr. Williams in the sum of $461.28, together with interest and costs. From this judgment the association prosecutes this appeal.

The basic facts are not substantially in dispute. Williams was one of the organizers of the appellant association. He was a director from 1922 to 1935, and for several years was vice-president. From 1922 to 1928 he owned several peach orchards. These he signed up with the association under regular marketing agreements and was paid accordingly. In 1928 he lost, through foreclosure, all of his owned orchards. In 1929 and thereafter he leased from their owners various peach orchards. These he signed up with the association under what he believed were renter member contracts as defined by the January 15, 1924, resolution. As to all these leased orchards he was paid market price less 25c per ton for his peaches.

In 1933 he leased the Merci orchard from its then owner. On May 17, 1933, he entered into a written contract with the association in reference to this orchard, and was paid for that season under this contract market price less 25c per

ton.   In 1934 Williams again leased the Merci orchard from
its new owner, the Federal Land Bank in Berkeley, where-
upon the association and Williams agreed to renew the con-
tract of 1933.

The contract that is here involved was the printed form
of the regular marketing agreement, and expressly provided
that the price to be paid for the peaches was the pooled price
less 5 per cent and expenses.   The contract was executed
on behalf of the association by F. B. Schmitt, assistant secre-
tary, and one of the managing agents of appellant.   Schmitt,
as a witness on behalf of appellant, testified that at the time
the contract was signed he wrote on the cover of the contract
near the bottom the words ''Renter Member'' and the word
''None''.   This last word was written over the words ''Mem-
bership Fee, $5.00, Organization ——, Total ——'' printed
on the cover of the contract.   Schmitt also testified that
before the contract was signed Williams had come to him
and stated that he had rented or could rent the Merci or-
chard; that he would sign this ranch with the association only
on condition he would do so as a renter member; that the
contract was thereafter executed on the definite understand-
ing that Williams was signing a renter member contract en-
titling him to payment in accordance with the 1924 resolution;
that the words ''renter member'' appearing on the cover of
the contract were intended by him to mean that Williams
was in fact a renter member and that the resolution of 1924
was to control the amount of payment.   Williams corrob-
orated Schmitt as to the circumstances surrounding the exe-
cution of the contract, and as to the intent of the parties.
The evidence is uncontradicted that the association through
Schmitt, and Williams on his own behalf, believed and in-
tended that the legal effect of the transaction was to make
Williams a renter member entitled to market price less 25c
per ton for his fruit, and that when the words ''renter
member'' were placed in the contract by the contracting
parties, to them, those words had that meaning.   The evi-
dence also shows that when the contract was filed with the
association, it was given a distinctive number—7001.   Schmitt
testified that regular member contracts were numbered under
4000; that the larger numbers were reserved for renter mem-
bers; that the number 7001 on the Merci contract would
immediately indicate to the employees of the appellant that

Williams was entitled under that contract to be paid market price less 25c per ton. It also appears that when contract 7001 was filed by appellant the words "Renter Member" were typed on the cover near the top immediately under Williams' name so that it could easily be identified as a renter member contract in the vertical files of appellant. Also the records of appellant indicate that after Williams' name appearing therein there was written the words "renter member". This was done, according to Schmitt, to indicate to the employees of appellant that the basis of payment under this contract was market price less 25c per ton.

The evidence also shows that Schmitt on behalf of the association entered into many similar renter member deals with other renters; that the uniform custom and practice of the association was to have such renters sign the regular marketing agreement with the words "renter member" written thereon; that it was explained to such renters that this was the procedure necessary to be followed in order to make them renter members entitled to receive market price less 25c per ton for their fruit as provided in the 1924 resolution; that such renters would not have signed up as regular members; that from 1924 until the new board of directors was elected in 1935 the association so interpreted its obligations under such contracts and paid such renters market price less 25c per ton for their fruit.

As already indicated, Williams was paid in 1933 in accordance with the understanding of the parties. In 1934 he was paid on the same basis, but was overpaid $461.28, the association failing to deduct the selling price of some fertilizer purchased by him. When he received his 1934 payments he believed, of course, that, as in the year 1933 (and other years), he was being paid in accordance with the agreement of the parties, market price less 25c per ton. He also testified, and his testimony is not contradicted, that other than the checks themselves, many of which at his order were delivered directly to the landlord and other persons, he had never received any statement of account from the association. He testified that he had confidence in the association's officers and employees and left the matter of bookkeeping and payment to them.

It is obvious that the trial court's decision is in exact accord with the mutual understanding, intent and agreement

of the parties. Appellant, while necessarily admitting that fact, contends that such mutual understanding, intent and agreement cannot be given effect for the reason that the written contract provides for the pooled price less 5 per cent and expenses, and contends that the agreement to pay market price less 25c per ton rests solely in parol, and that to show its existence violates the parol evidence rule. We are of the opinion that the showing of the agreement to pay market price less 25c per ton did not violate the parol evidence rule, for several reasons. In the first place it is our opinion that the written agreement, properly interpreted, provided for such payment. Before directly discussing this conclusion reference should be made to certain pertinent code sections.

Section 1856 of the Code of Civil Procedure provides that "When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing, except in the following cases:

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings;

"2. Where the validity of the agreement is the fact in dispute. But this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in section eighteen hundred and sixty, or to explain an extrinsic ambiguity, or to establish illegality or fraud . . . "

Section 1860 of the Code of Civil Procedure, referred to in section 1856, provides that "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret". See, also, section 1647 of the Civil Code.

Section 1861 of the Code of Civil Procedure provides that "The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they have a local, technical or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement

must be construed accordingly.'' See, also, sections 1644 and 1645 of the Civil Code.

Section 1859 of the Code of Civil Procedure and section 1636 of the Civil Code require the court in interpreting a contract to enforce the intent of the parties, if possible.

Section 1625 of the Civil Code provides that ''The execution of a contract in writing whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.'' Section 1640 of the same code provides that ''When, through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded.''

Other sections could be referred to embodying the same or similar principles. Under these sections, in the absence of fraud, mistake or accident, the clear and unambiguous words of a written contract cannot be varied by oral testimony—ordinarily parol limitations on the operation of the contract cannot be shown. But it is equally well settled that where ambiguity exists, or where the provisions of a contract are conflicting, oral testimony is admissible to explain such ambiguity or conflict.

█ Without now considering whether there was a mutual mistake of law as to the legal effect of the instrument sufficient to permit the introduction of oral evidence (a point discussed, at some length in the Stafford case, *Stafford* v. *California C. P. Growers, ante,* p. 212 [78 Pac. (2d) 1150] decided this day, in a different connection) in the present case the parties placed on the cover of their written contract with intent that they should be a part of such contract the words ''Renter Member''. It has long been the rule in California that the parties to a written contract may show by parol that terms appearing therein after the signature, or on other places on the document where they ordinarily would not be part of the contract, were in fact intended by them to be part of the contract. (*Verzan* v. *McGregor,* 23 Cal. 339; *Berry* v. *Kowalsky,* 95 Cal. 134 [30 Pac. 202, 29 Am. St. Rep. 101]; *Spotton* v. *Dyer,* 42 Cal. App. 585 [184 Pac. 23]; *Shelley* v. *Hart,* 112 Cal. App. 231 [297 Pac. 82]; *Storm & Butts* v. *Lipscomb,* 117 Cal. App. 6 [3 Pac. (2d) 567].) Both of the parties who signed the contract testified

that it was their intent that the terms "renter member" should be a part of the contract. It is not open to question, under the above cases, that this was properly shown by parol.

■ Once this hurdle has been overcome it is equally clear that the phrase "renter member" may be explained by oral testimony. Obviously such a phrase creates an ambiguity. The phrase indicates that it was placed on the contract to distinguish this type of contract from other contracts dealing with other types of members. If so, why was it done and what was intended? Both of the parties who signed the contract testified that the phrase had a special, technical, definite and peculiar meaning to them—that it meant that the new member was to become a renter member as defined in the resolution of 1924; that the provisions of that resolution were intended to be part of the contract and to override the provisions in the contract as to the manner of payment. Such a situation is expressly covered by statute. (Sec. 1861 of the Code of Civ. Proc., *supra;* also, secs. 1644 and 1645 of the Civ. Code. See, also, *Shean* v. *Weeks,* 176 Cal. 592 [169 Pac. 231]; *Gianelli* v. *Globe Grain & Milling Co.,* 48 Cal. App. 103 [191 Pac. 720].)

■ Not only did the parties testify that the phrase had this technical meaning to them, but, in view of the ambiguity thus created, it is also of considerable evidentiary importance that between 1929 and 1934 the two parties had entered into identical contracts and had construed them as here contended for by respondents. The very contract here involved had been so construed by both parties for the year 1933. It also appears that this construction was placed on many other contracts of other renters by appellant during the period 1924 to 1935, and that this was known by Williams. Previous and contemporaneous transactions may be considered to ascertain the sense in which the parties to a writing used particular words. (*Cabrera* v. *Thannhauser & Co.,* 183 Cal. 604 [192 Pac. 45].) The rule of practical construction is too well settled to require further comment.

■ There is another and complete answer to appellant's contention. If we assume that the contract to pay market price less 25c was entirely oral, and that the written contract provided for the pooled price less 5 per cent and expenses, nevertheless appellant is not now in a position to recover

payments made under the oral contract. Section 1698 of the Civil Code permits the parties to a written contract to modify the same by an executed parol agreement. That section provides: "A contract in writing may be altered by a contract in writing, or by an executed oral agreement and not otherwise." The evidence in the instant case demonstrates that respondent has fully performed the terms of the oral contract for the year 1934. It also appears by stipulation that not only has the association fully performed by paying to respondent the full amount due him under the alleged oral contract, but has in fact overpaid him. The money that was paid to respondent by the association was paid with the intention of performing the agreement to pay respondent market price less 25c per ton. The fact that on the books of the company the payments made to respondent and other renters in excess of those paid owner members were labeled "advances" is immaterial. Respondent had nothing to do with the keeping of the books nor did he know how they were kept. The uncontradicted evidence shows that this practice was followed in the case of every renter member, had been followed for many years, and was employed merely as a bookkeeping convenience. Appellant urges that the general account between the parties was still open. That may be true as to the general account, but the Merci ranch deal for 1934 was a separate and distinct transaction covered by a separate contract, and as already indicated has been fully executed. Under such circumstances even if the agreement to pay the market price less 25c per ton were entirely oral, having been fully executed, it would constitute a modification of the written agreement.

Appellant next urges that the resolution of 1924 was *ultra vires* and illegal. This contention has been fully considered in the Harkey (*California C. P. Growers* v. *Harkey, ante,* p. 188 [78 Pac. (2d) 1137]) and Stafford cases decided this day. What was there said need not be repeated in this opinion. For the reasons set forth in those opinions it is concluded that even though the contract was *ultra vires* the by-laws the appellant is bound thereby. It should be particularly noted that the contract here involved has been fully executed, and as to such contracts the doctrine of *ultra vires* is not available.

■ There is another factor in reference to the doctrine of *ultra vires* that should be referred to. We have already held, in discussing the parol evidence rule, that the only contract signed and agreed to by the parties was a contract to buy and sell the Merci orchard fruit for market price less 25c per ton. If that contract could be voided by the association because it was *ultra vires*, even then the association could recover nothing in this action. The position of appellant has two aspects—first, it seeks to avoid the actual contract of the parties, and second, it seeks to substitute for it an owner contract—a contract never agreed to. In other words, the association is seeking not only to destroy a contract the parties did make and did perform, but also to substitute in its place a contract the parties did not make and did not perform. If the contract the parties did make were destroyed, the courts have no power to make a new contract for them. If the only contract between them were destroyed, then it would appear that the association would be liable on a *quantum meruit*—that is market price—an amount in excess of that which it has paid respondent.

■ Appellant next urges that Williams was a director of appellant and a former vice-president, and that as to him a different rule should apply than would be applied to third parties dealing with the corporation. There is no evidence that Williams in reference to the transaction here involved in any way took advantage of his position of trust and confidence. The Merci ranch deal for 1934 was not an unusual one. It was a normal, ordinary business contract offered to all renters indiscriminately. The fact that he had been an owner member or director or officer does not affect the Merci ranch deal for 1934. Appellant concedes that a regular member or director or officer who had signed up one or more orchards with the association was under no legal or moral obligation to place other orchards owned or rented by him in the association. Each orchard is covered by a separate contract. As concerns Williams' freedom of choice in reference to the Merci orchard it could make no difference whether he was a director, vice-president or owner member of the association. He was as free as any other grower or renter to bargain with the association in reference to that orchard. There is no evidence that in so doing he abused his confidential position. He entered into the same deal on exactly the

same terms that were offered to renters generally, and that deal was not clandestine nor secret but was authorized by a formal resolution of the board of directors.

The appellant urges that the trial court committed reversible error in failing to find on certain issues. It is first contended that there is no finding on the application of the parol evidence rule. The trial court did find that the resolution of 1924 was passed by the directors and that pursuant thereto appellant and Williams entered into a "written contract" to buy and sell the Merci orchard fruit for 1934. That is a proper finding of the ultimate fact, and is in accord with the interpretation of the contract found in this opinion. It is next contended that the trial court failed to make an express finding as to the validity of the 1924 resolution—that the findings do not disclose whether the trial court found it valid or invalid, and if invalid upon what ground such invalidity does not affect the contract. It is true that the findings do not disclose the theory of the trial court in reference to the resolution. The findings, however, are in exact accord with the issues framed by the pleadings. Every ultimate fact was covered by findings. That is all that is required. Moreover, under the circumstances here involved where the facts are not substantially in dispute, if findings were required on these issues it would avail the appellant nothing in view of the power conferred on this court by section 956a of the Code of Civil Procedure.

The appellant next complains that the trial court committed reversible error in refusing to admit into evidence the depositions of defendants alleged to have been taken under section 2021 of the Code of Civil Procedure. Both defendants were present in court at the time of the trial. Both were called as witnesses by plaintiff under section 2055 of the Code of Civil Procedure and fully examined. In addition Mr. Williams was called as a witness by defendant and cross-examined by plaintiff. No attempt was made by plaintiff to use the depositions during such examinations for impeachment purposes. Assuming that the depositions offered were taken under section 2021 of the Code of Civil Procedure, and assuming without deciding that under the rule enunciated in *Hurtel* v. *Albert Cohn, Inc.*, 5 Cal. (2d) 145 [52 Pac. (2d) 922], such depositions should have been admitted in evidence, the error is not a reversible one. We have read the proffered

depositions and find nothing contained therein that would cause us to change our views as to the legal effect of the transaction here involved. Under Article VI, section 4½ of the Constitution the error, if any, does not require a reversal.

As in the Harkey and Stafford cases some point is here made by appellant that the renter member deals were kept secret, and from that fact appellant seeks to indulge in unfavorable inferences. The point has been fully discussed in the prior cases. As in those cases, the evidence in the present case (even if the point were important) is against appellant's contention.

The other points urged by appellant are without merit.

The judgment appealed from is affirmed.

Houser, J., and Langdon, J., deeming themselves disqualified, did not participate herein.

Rehearing denied.