[S. F. No. 17401. In Bank. Mar. 23, 1949.]

A. J. OLSON et al., Respondents, v. BIOLA COOPERA-
TIVE RAISIN GROWERS ASSOCIATION (a Corpo-
ration) et al., Appellants.

Chester R. Andrews, William C. Crossland, Lawrence W. Young and Milo Popovich for Appellants.

Irvine P. Atten, Aynesworth & Hayhurst, G. I. Aynesworth and L. Nelson Hayhurst for Respondents.

SPENCE, J.—Following the granting of a rehearing, further consideration of the issues presented on this appeal leads to the conclusion that our former opinion correctly disposed of such issues, and said opinion is therefore adopted as follows:

Biola Cooperative Raisin Growers Association was organized as a nonprofit cooperative marketing association under the laws of the state of California. Plaintiffs—four members of the association—brought this action, a representative suit, against the association and the other sixteen members thereof, including the five directors, to recover liquidated damages alleged to be due by virtue of the delivery of raisins deemed to be substandard under the provisions of the marketing agreement between the association and its various members. Eight of the individually named defendants were found to be so liable in conformity with the theory of plaintiffs' complaint, and judgment accordingly was entered against them in varying amounts computed upon the basis of their substandard tonnage

delivery to the association, the total sum being $19,856.79, plus interest, and costs. These defendants have appealed from such judgment, urging, as a principal ground for reversal, that liquidated damages were not properly assessable against them under the record in this case. Consideration of the language of the marketing agreement and the statutory regulations governing the disposition of such damage claim as is here made demonstrates the merit of defendants' argument distinguishing their default as one in quality rather than in quantity of crop delivery.

The record reveals that on October 20, 1944, plaintiff Chris H. Scheidt, ''a grower member of the . . . Association,'' entered into an agreement with the association whereby he undertook to process and pack the ''raisin crop'' of the association ''for the year 1944'' for a specified sum per ton. He rented the association's packing house for the season, and the association's members were obligated to deliver their raisins there ''properly cured and in good condition'' under the terms of their marketing agreement with the association. Delivery of the raisins to Scheidt at the packing house commenced soon after the date of the packing agreement and was concluded early in 1945. Although the association was empowered under the marketing agreement to set up quality standards regarding ''sugar and moisture content'' to ''be met by all raisins delivered by the Grower[s],'' it had not done so. However, it appears that 55 per cent of the raisin crop in question was under contract for sale to the United States Government, and the federal regulations, introduced in evidence, permitted a moisture content of ''not more than 18 per cent.'' Gauged by this standard, there was substantial evidence that some of the raisins delivered by the eight grower members of the association against whom judgment was rendered had a higher moisture content so that they could not be run through the stemmer and processed without further drying. Finding that such raisins ''were not properly dried and cured but were too wet and contained too much moisture and were too heavy for processing and marketing,'' the trial court determined the exact weight of the defective delivery made by each of the eight defaulting growers and accordingly proportioned against them plaintiffs' recovery of liquidated damages.

All of the members' raisins, both wet and dry, were delivered at the packing house, which was under the control of plaintiff Chris H. Scheidt. He received them, knowing at the

time of delivery or shortly thereafter that some of them were wet. He did report that fact to the officers of the association but the wet raisins were neither rejected nor returned, and both he and the association continued to permit the delivery and acceptance of wet raisins, all of which were ultimately sold. Some of the growers who had delivered wet raisins offered to remove them from the packing house and properly cure them at their own expense, but they were not permitted to do so. However, it appears that under the government regulations, all of the raisins—both wet and dry—were sold for $180 per ton and each grower received an additional $10 per ton as an "incentive payment" or reward for drying his grapes instead of selling them fresh, so that no one suffered any loss by reason of the delivery of wet raisins.

With these basic factual considerations at hand, the determinative issue is whether plaintiffs, as representative members of the association, may enforce the collection of liquidated damages for the default in question, premised solely upon the allegation that after demand, the directors failed to act because three of them, a majority of the board, were interested parties, having themselves delivered wet raisins to the packing house. The answer to this problem lies in an analysis of certain provisions of the association's marketing agreement with its members, in the light of applicable language in the Agricultural Code bearing upon the exception of cooperative marketing associations from the rules governing the enforcement of liquidated damage claims under the general law of this state as expressed in sections 1670 and 1671 of the Civil Code.

Section 1 of the marketing agreement reads: "The Association buys and the Grower sells to the Association annually from the date of the signing of the By-Laws of the Association and this agreement *all* of the raisins owned and grown by the Grower, and agrees to deliver the same and all thereof *properly cured and in good condition* to the plant of the Association." (Emphasis added.)

Section 7 of the agreement contains the following stipulation: "In the event that Grower should *fail to deliver raisins* hereby sold *in accordance with terms of this agreement* and these By-Laws, such act will injure the Association to an amount that is, and will be impracticable and extremely difficult to determine and fix, and that is, therefore, *fixed at the amount of Twenty-five (25%) per cent of the average current seasonal price for each and every ton of raisins that the*

*Grower fails to deliver in accordance with the terms hereof* and these By-Laws, and which amount the Grower agrees to pay, and shall pay, to the Association upon demand . . ." (Emphasis added.)

And section 13 of the agreement states in part: "It is expressly understood and agreed that Grower has by this agreement agreed to and *will deliver the raisins herein contracted to be delivered to the Association,* or in lieu thereof to pay *liquidated damages* therefor as by this agreement provided for his *failure so to do.* . . ." (Emphasis added.)

Section 1209 of the Agricultural Code provides: "The by-laws or the marketing contract may fix, as *liquidated damages,* specific sums to be paid by the member or stockholder to the association upon the breach by him of any provision of the marketing contract regarding the *sale* or *delivery* or *withholding of products*; . . . and such clauses providing for liquidated damages shall be enforceable as such and shall not be regarded as penalties." (Emphasis added.) And the first paragraph of section 1213 of said code states: "Any provisions of law which are in conflict with this chapter shall not be construed as applying to the associations herein provided for."

█ The general rule in this state is that a contract which undertakes to fix the amount of damages in anticipation of a breach of an obligation is void to that extent (Civ. Code, § 1670) except "when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage." (Civ. Code, § 1671.) Accordingly, it is held that a party relying on a liquidated damage clause in a contract must plead and prove the facts validating his right to recover such predetermined amount. (*Dyer Bros. Golden West Iron Works* v. *Central Iron Works,* 182 Cal. 588, 593 [189 P. 445]; *Robert Marsh & Co., Inc.* v. *Tremper,* 210 Cal. 572, 576 [292 P. 950]; *Rice* v. *Schmid,* 18 Cal.2d 382, 385 [115 P.2d 498, 138 A.L.R. 589]; *Kekich* v. *Blum,* 43 Cal.App.2d 525, 527-528 [111 P.2d 411].)

However, an important exception to the general rule on the remedy of liquidated damages prevails in the case of a nonprofit cooperative marketing association, as declared by section 1209 of the Agricultural Code above quoted. This exception permits such an association and its members to stipulate in advance the amount of damages to be paid upon the breach of an obligation in the particulars of "the sale or delivery or withholding of products" forming the object of their agree-

ment. While such statutory language constitutes a grant of power, that power is confined to the three subjects specifically mentioned so that any undertaking on the part of the association to go beyond those stated limits must fall within the provisions of sections 1670 and 1671 of the Civil Code, which, as heretofore noted, permit the recovery of liquidated damages only where it would be impracticable or extremely difficult to estimate actual damages—a matter of pleading and proof resting on the party seeking such redress.

Even in the absence of statute it was well established in this state that a nonprofit cooperative marketing association might contract for the payment by a member of a stipulated sum for the violation of his agreement to deliver *all* of his product to the association for processing and marketing. (*Anaheim Citrus Fruit Association* v. *Yeoman,* 51 Cal.App. 759, 764 [197 P. 959]; *Poultry Producers of Central California, Inc.* v. *Murphy,* 64 Cal.App. 450, 455 [221 P. 962]; *California Canning Peach Growers* v. *Downey,* 76 Cal.App. 1, 11-12 [243 P. 679]; *California Canning Peach Growers* v. *Harris,* 91 Cal.App. 654, 655 [267 P. 572]; see, also, *Poultry Producers of Southern California, Inc.* v. *Barlow,* 189 Cal. 278, 280-281 [208 P. 93]; *California Bean Growers' Association* v. *Rindge Land & Navigation Co.,* 199 Cal. 168, 183 [248 P. 658, 47 A.L.R. 904].) The validity of such a liquidated damage provision stemmed from the principle that the whole business scheme of the marketing association necessarily depended upon its ability to hold and control the subject matter of its operations, a consideration demonstrating the disrupting effect which a member's failure to deliver all of his product to the association would have on its successful functioning and the consequent elements of damage which would not be capable of any exact estimation. As was so aptly stated with regard to such breach in delivery to the citrus fruit cooperative involved in the Anaheim case, *supra,* at pages 763-764: ''The existence and life of the association itself depended upon its being furnished fruit to dispose of in the public market. A reduction in the amount of fruit so handled would not only tend to increase the overhead cost to the non-transgressing members, but, we may assume, to some extent affect the prestige and standing of the association as a marketing concern. The argument would be the same, regardless of the quantity of fruit which might have been delivered by the defendant, whether it composed but a small fractional part or one-half or more of the entire product designed to be mar-

keted by the plaintiff agency [the association]. Enough has been said, we think, to show that the case falls within the class as to which the law permits damages to be liquidated by contract in advance of their occurrence [Civ. Code, § 1671]. It follows as a necessary conclusion that plaintiff was entitled to recover the exact amount fixed in its contract as the sum per box which defendant should pay by reason of his failure to market [his] fruit in the manner agreed." The same line of reasoning was followed in *Irwindale Citrus Assn.* v. *Semler*, 60 Cal.App.2d 318, 323 [140 P.2d 716].

But all of these cases involved the *quantity* of the product contracted for delivery to the marketing association and the significance of a member's breach in that respect, so that a part of his product was released for distribution through other channels in competition with the cooperative enterprise and to the detriment of all the members thereof. The *quality* of the fruit delivered was not an issue and was not considered. The same distinguishing observations apply with respect to delivery breaches discussed in similar cases from other jurisdictions. (See 25 A.L.R. 1113; supplemented in 33 A.L.R. 247; 47 A.L.R. 936; 77 A.L.R. 405; 98 A.L.R. 1406.) In the instant case the *quantity* of the raisins delivered is not a point of dispute, as it is admitted that the members delivered *all* of their raisins to the Association for marketing. Rather here it is the *quality* of the raisins that is at issue, so that the present problem transcends the scope of the decided cases. However, they are significant because of their discussion of the economic considerations which tend to indicate the design of the statutory law expressive of the legislative policy with regard to the availability of liquidated damages in protecting the integrity of a cooperative marketing association.

Pursuant to these preliminary remarks, there is to be considered at the outset whether or not the grower members of the association who delivered wet raisins to the packing house violated their marketing agreement in any of the particulars specified in section 1209 of the Agricultural Code—that is, in regard to "the sale or delivery or withholding of products," as those terms are used in said section. Section 1 of the marketing agreement contemplates a sale of the raisins by the grower to the Association when it provides that "the Association buys and the Grower sells to the Association . . ." his crop of raisins—a sale with future delivery. This brings into operation the provision of section 1208 of the Agricultural Code that if a contract of sale is made, "it shall be conclu-

sively held that title to the products passes absolutely and unreservedly, except for recorded liens, to the association upon delivery." So here a sale of the raisins occurred and was completed upon delivery to, and acceptance by, the association and the packer Scheidt. In contrast to such "sale" arrangement as here prevails, cooperative marketing agreements frequently provide for an agency relationship, under which the grower agrees to deliver his crop to the association and appoints the association his agent to handle and market the crop for him and to return the net proceeds to him—a mere "delivery" arrangement whereby title to the crop does not pass to the association. But the equal importance of faithful performance of either type of obligation is expressly recognized in section 1209 in the specific mention of "sale or delivery . . . of products." The third reference in section 1209, the "withholding of products," would appear to apply to any act of the grower in holding back from the association any part of the crop which he has either sold or is otherwise bound to deliver to the association for marketing. As each grower member admittedly turned over *all* his raisins to the association, and therefore made no default in performance with respect to quantity, we are of the opinion, for the reasons hereinafter stated, that a proper construction of the provisions of said section 1209 leads to the conclusion that plaintiffs failed to show a breach of any of the three conditions enumerated as the premise for the recovery of liquidated damages.

The above view of the qualifying language of section 1209 of the Agricultural Code follows the theory that the right to delivery of its members' products is the most important right of a cooperative marketing association, a matter that was forcefully adjudicated in this state in the Anaheim and succeeding cases above cited, and which principle of judicial decision presumably governed the Legislature's correlative statutory action on the subject. (23 Cal.Jur. 783, § 159.) It was the *quantity*, not the *quality*, feature of the members' delivery that was considered the lifeblood of the cooperative and essential to the maintenance of its place in the competitive market. That such was the Legislature's concept of the need for liquidated damages as a protective measure for cooperatives appears from other related sections of the Agricultural Code. Thus section 1210 provides that "In the event of any *such* breach or threatened breach of such marketing contract by a member, the association shall be entitled to an injunction to prevent the further breach of the contract and to a decree of

specific performance thereof.'' (Emphasis added.) In so making the remedies of injunction and specific performance available to a cooperative marketing association on the same basis as the remedy of liquidated damages—that is, for the type of breach mentioned in section 1209, one ''regarding the sale or delivery or withholding of products''—the Legislature must have intended such judicial enforcement with relation to the members' promised delivery in *quantity* rather than to have the court undertake detailed supervisory measures to insure delivery not merely as to amount but likewise as to the *quality* of the product, depending on the performance of various farming operations which would yield the desired standard. Likewise section 1211 provides that ''In any action upon such marketing agreements, it shall be conclusively presumed that a landowner or landlord or lessor is *able to control the delivery of products produced on his land* by tenants or others, . . .; and in such actions, the foregoing remedies for nondelivery or breach shall lie and be enforceable against such landowner, landlord or lessor.'' (Emphasis added.) In so recognizing that a grower might attempt to evade his obligation as to delivery under the marketing agreement by leasing his land to another, thus supposedly divesting himself of control over the crop, and in rendering such device ineffectual, the Legislature again evinced its intent that the matter of delivery within the landowner's control would be the *quantity,* not the *quality* dependent on various practices of husbandry that might prevail on the farm. In other words, these provisions all point to the fundamental tenet of exclusive dealing between such association and its members, in the sense of full delivery of the promised product, as the limit of legislative concern, and not the added consideration of variance in the condition of the product delivered with the involvement of multiple details as to farming operations.

■ While plaintiffs do not cite any section of the Agricultural Code that specifically permits contracting for the recovery of liquidated damages for breach of an agreement as to the *quality* of the product to be delivered, they claim that such would be within the scope of the reference in section 1209 to ''*any* provision of the marketing contract regarding the sale or delivery or withholding of products.'' In pursuance of this position, plaintiffs argue that in section 1 of the marketing agreement each grower contracted to deliver his raisins ''properly cured and in good condition,'' and that this covenant was breached by the delivery of wet raisins;

that in section 7 each grower agreed to pay the liquidated damages if he failed to deliver his raisins "in accordance with the terms of this agreement"; that this covenant was broken by the delivery of wet raisins which were neither "properly cured" nor "in good condition"; that thereupon the agreement to pay liquidated damages came into effect and could be enforced within the intent of the "omnibus provisions" of section 1209. They also argue that under the quoted language of section 1213 of the Agricultural Code, the provisions of section 1670 and 1671 of the Civil Code have no application in this case. But to construe section 1209 as an "omnibus" provision would in effect eliminate any premise of limitation consistent with the three particulars mentioned as the basis for the contracting for liquidated damages and would allow such remedy for the breach of "any provision of the marketing contract," without qualification. However, the statute does qualify the availability of the remedy and, as above construed, it refers to "delivery" as embracing an agency relationship in contrast to a "sale," as here prevails. Accordingly, the word "delivery" cannot be said to connote there, as plaintiffs contend, "time, place, manner, object, quantity and quality"—an "omnibus" concept which would far exceed the idea of the fact of delivery of the promised amount as a measure of assurance to the cooperative marketing association that its whole scheme of organization would not be nullified by some of the product of its members reaching the public market through outside competitive channels, to its disadvantage and, perhaps, to its ultimate break-up. Since upon the record plaintiffs' claim involves the *quality,* not the *quantity,* of raisins delivered, the provisions of sections 1670 and 1671 are not in conflict with the provisions of the Agricultural Code insofar as the facts of this case are concerned, and section 1213 of the latter code does not aid their position.

Moreover, a study of the entire marketing agreement leads to the conclusion that it was the intention of the contracting parties to provide for the recovery of liquidated damages only when a grower member failed or refused to deliver *all* his raisins to the Association. Such overall examination accords with the fundamental rule that the determination of the meaning of a contract depends, in each case, upon the intent of the parties as evidenced by the entire agreement construed in the light of the circumstances under

which it was made. (Civ. Code, §§ 1636, 1641; *Ogburn* v. *Travelers Insurance Co.,* 207 Cal. 50, 52 [276 P. 1004].) In other words, the " 'sense and meaning of the parties to any particular instrument should be collected *ex antecedentibus et consequentibus*; that is to say, every part of it should be brought into action, in order to collect from the whole one uniform and consistent sense, if that may be done.' " (*Balfour* v. *Fresno Canal & Irrigation Co.,* 109 Cal. 221, 227 [41 P. 876].)

So pertinent are these considerations of language in the parties' marketing agreement. Section 13 appears to be a summary of the prior provision on the subject of liquidated damages. It conditions the agreement to pay such sum upon the fact of failure to deliver. Likewise section 7, containing the agreed terms for the liquidated damages, suggests that it was intended to apply upon failure to deliver the full amount of the product, and not upon failure in the quality of the product. In addition to other provisions, the section expressly states that it would be "impracticable and extremely difficult to determine and fix" the damages "in the event that Grower should fail to deliver raisins hereby sold in accordance with the terms of this agreement," and accordingly, the damage liability is related directly to the circumstance of default in the promised tonnage of raisins. It has been held that such declaration is a true statement of a fact in the case of the failure to deliver to a cooperative marketing association, as the subject has been exhaustively discussed in the above-noted decisions in this and other jurisdictions. But the same result does not prevail in the case of the delivery of substandard raisins for the reason that raisins are graded, and each grade has an ascertainable market value which may vary from season to season and from time to time. Raisins not properly cured, of course, have a less market value than those properly cured. The loss from a violation of the contract specification as to *quality* may be ascertained and determined under the ordinary rules of the law of damages. (*Rice* v. *Schmid, supra,* 18 Cal.2d 382, 385-386.) That the parties had such principle in mind for the assessment of damages in the event of delivery of a substandard lot of raisins appears from their failure to provide in their agreement a variable pecuniary standard, according to the degree of default, for the computation of liquidated damages rather than a flat rate which might be far in excess of the actual damages sustained where the default in quality was slight, and the re-

sultant damage obligation would partake of the nature of a penalty, contrary to "the effort of the law" to "work [an] equitable result" in casting "upon the delinquent party a liability to respond to" a reasonable assessment of damages. (*Anaheim Citrus Fruit Association* v. *Yeoman, supra,* 51 Cal.App. 759, 761; *Mente & Co., Inc.* v. *Fresno Compress & Warehouse Co.,* 113 Cal.App. 325, 330-331 [298 P. 126].) Likewise the flat rate of liquidated damages provided in the marketing agreement might be wholly inadequate if the fruit delivered was greatly below the promised standard or the nature of the defect was such that the substandard lot might contaminate the other lots of raisins of the association with which it was mixed, and so cause a very substantial loss, which the parties could not have reasonably anticipated in predetermining the damage liability as a "fair compensation for the loss sustained." (*Rice* v. *Schmid, supra,* 18 Cal.2d 382, 386.)

In the light of the foregoing discussion, plaintiffs' position on this appeal cannot be sustained. The provisions of the Agricultural Code do not authorize a contract for the recovery of liquidated damages because of the inferior quality of the product delivered to and accepted by a nonprofit cooperative marketing association; and an analysis of the particular marketing agreement here in question does not show such damage liability to have been within the contemplation of the parties.

The judgment is reversed.

Gibson, C. J., Shenk, J., and Edmonds, J., concurred.

CARTER, J.—I dissent. I disagree with the position taken by the majority in this case. That position is not only not in accord with the various statutory provisions involved, but in effect holds that this court will not enforce the terms of a contract, which is not illegal or in contravention of public policy, and which was made by parties capable of contracting.

It seems quite apparent to me that the result reached in the majority opinion is achieved by ignoring the facts involved and concentrating on the unexpressed thought that to do otherwise would be to come to a harsh result. It also seems quite apparent to me that if I contract to buy a horse with four sound legs and I am sold one with only three legs I should be able to enforce my contract. However, I may be assuming too much—as the three-legged horse might be

able to walk, and the majority of this court would therefore hold that I got all that I bargained for.

Biola Cooperative Raisin Growers Association was organized as a nonprofit cooperative marketing association under the laws of the State of California. Plaintiffs, four members of the Association, brought this action, a representative suit, against the association and the other 16 members thereof, including the five directors, to recover liquidated damages alleged to be due by virtue of the delivery of raisins of substandard quality under the provisions of the marketing agreement between the Association and its various members. Eight of the individually named defendants were found to be so liable in conformity with the theory of plaintiffs' complaint, and judgment was accordingly entered against them in varying amounts computed on the basis of their tonnage delivery of raisins of defective quality. The total sum amounted to $19,856.79 plus interest and costs. These defendants have appealed, contending that liquidated damages were not properly assessed against them for several reasons hereinafter stated.

On October 20, 1944, plaintiff Chris H. Scheidt, a grower member of the association, entered into an agreement with the association whereby he undertook to process and pack the raisin crop of the association for the year 1944 for a specified sum per ton. He rented the association's packing house for the season, and the association's members agreed, in writing, to deliver their raisins there ''properly cured and in good condition.'' The contract provided further that he would ''perform said packing operations according to the instructions of the Association and the specifications provided by the government in packing same.'' The pertinent provisions of the marketing agreement entered into by all grower members in 1941 with the association are as follows:

''Section 1: The Association buys and the Grower sells to the Association annually from the date of the signing of the By-Laws of the Association and this agreement all of the raisins owned and grown by the Grower, *and agrees to deliver the same and all thereof properly cured and in good condition to the plant of the Association. . . .*''

''Section 5: The Association reserves the power to set standards of maturity, quality, sugar, and moisture content, which must be met by all raisins delivered by the Grower. . . .

''Section 7: In the event that Grower should fail to deliver raisins hereby sold in accordance with the terms of this

agreement and these By-Laws, such act will injure the Association to an amount that is, and will be impracticable and extremely difficult to determine and fix, and that is, therefore, fixed at the amount of Twenty-Five (25%) percent of the average current seasonal price for each and every ton of raisins that the Grower *fails to deliver in accordance with the terms hereof and these By-Laws,* and which amount the Grower agrees to pay, and shall pay, to the Association upon demand, . . .

"Section 13: It is expressly understood and agreed that Grower has by this agreement agreed to and will deliver the raisins herein contracted to be delivered to the Association, or in lieu thereof to pay liquidated damages therefor as by this agreement provided for his failure so to do, . . .

"Section 14: It is further understood and agreed that should any controversy arise between the Association and the Grower pertaining to the *quality or quantity* of any raisins delivered, or to be delivered hereunder, and an agreement cannot be reached between the parties, that the same shall be referred to a board of arbitration consisting of three parties, one designated by the Board of Directors of the Association, one by the Grower, and one by the two so designated, and their decision in regard thereto shall be final and binding upon both parties hereto." (Emphasis added.)

Shortly after the packing agreement with Chris H. Scheidt had been entered into, the growers began delivery to him under the terms of their agreements with the association. The deliveries were concluded early in 1945. Although the association had reserved the power to set standards of maturity, quality, sugar, and moisture content it had not done so. However, it appears that 55 per cent of the raisin crop in question was under contract for sale to the United States government, and the federal regulations, introduced in evidence, permitted a moisture content of "not more than 18 per cent."

In accordance with the marketing agreement, and upon the basis of the standard set by the government, arbitration proceedings were had on November 26, 1945, between the members of the association, with the exception of defendant J. H. Scheidt. The court ordered J. H. Scheidt to appoint an arbitrator within 30 days so that the arbitration with respect to the quality of his raisins could be disposed of, but Scheidt declined to do so, and consented to the court passing upon and determining the quality of raisins delivered by him

to the association, and at the trial introduced evidence upon that issue. The court confirmed the report of the arbitrators and found that, in accordance therewith, certain of the individual defendants, including J. H. Scheidt, had delivered raisins with excessive moisture content and the amount thereof.

There is substantial evidence, as will be shown in some detail later in this opinion, that some portions of the raisins delivered by the eight grower members of the association against whom judgment was rendered were so high in moisture content that they could not be run through the stemmer and processed without further drying. Finding that such raisins "were not properly dried and cured but were too wet and contained too much moisture and were too heavy for processing and marketing" the trial court determined the exact weight of the defective delivery made by each of the defaulting growers and accordingly proportioned against them plaintiffs' recovery of liquidated damages.

Defendants contend that plaintiffs could not recover liquidated damages without alleging and proving that actual damages would be "impracticable or extremely difficult to fix . . ." in accordance with the provisions of section 1670 of the Civil Code. That this is the general rule in this state where there is a contract which undertakes to fix the amount of damages in anticipation of an obligation has been so held in the following cases: *Rice* v. *Schmid,* 18 Cal.2d 382, 385 [115 P.2d 498, 138 A.L.R. 589]; *Robert Marsh & Co., Inc.* v. *Tremper,* 210 Cal. 572, 576 [292 P. 950]; *Dyer Bros Etc. I. Wks.* v. *Central Iron Wks,* 182 Cal. 588 [189 P. 445]; *Kekich* v. *Blum,* 43 Cal.App.2d 525 [111 P.2d 411]. But the Legislature has provided for an exception to this rule with respect to liquidated damages where a nonprofit cooperative marketing association is concerned. This exception, which is a grant of power to such cooperatives, is set forth in section 1209 of the Agricultural Code: "The by-laws or the marketing contract may fix, as liquidated damages, specific sums to be paid by the member or stockholder to the association upon the breach by him of any provision of the marketing contract regarding the sale or delivery or withholding of products; . . . and any such provisions shall be valid and enforceable in the courts of this State; and such clauses providing for liquidated damages shall be enforceable as such and shall not be regarded as penalties."

The majority say that the alleged breach by defendants does not fall within the above section of the Agricultural Code in that the intention of the Legislature was to provide for deliveries deficient in quantity, rather than deliveries of produce of defective quality.

In order to conclude that this contention has merit it is necessary to ignore certain terms of the marketing agreement entered into by each defendant with the association. It was there agreed that each grower should sell "all of the raisins owned and grown" by him, *and* that the grower "agrees to deliver the same and *all thereof properly cured and in good condition*." [Emphasis added.]

Section 1208 of the Agricultural Code provides in part that "If they contract a sale to the association, it shall be conclusively held that title to the products passes absolutely and unreservedly, except for recorded liens, *to the association upon delivery*; or at any other specified time if expressly and definitely agreed in the said contract." (Emphasis added.)

Section 1725(3) of the Civil Code provides that: "Where the parties purport to effect a present sale of future goods, the agreement operates as a contract to sell the goods and as soon as the seller acquires the goods the property therein shall pass to the buyer without further act if the parties so intend unless the agreement otherwise provides."

Section 1213 of the Agricultural Code provides that: "Any provisions of law which are in conflict with this chapter shall not be construed as applying to the associations herein provided for."

Construing these statutory provisions together with the marketing agreement, which made no provision for the time title was to pass, *it would appear that the sale of the raisins was to take place upon delivery of the raisins to the Association in accordance with the terms of the contract,* thus bringing the present case within the provisions of section 1209 of the Agricultural Code. That section provides that liquidated damages may be provided for upon the breach by a member "of any provision of the marketing contract regarding the sale . . . of products. . . ."

Why the majority feel it necessary to discuss the practice of delivery of produce by the grower to a cooperative association as agent for the sale of that produce is not clear. That practice is not involved here. It is also not clear just why the facts of this case do not bring it within the provisions of the Agricultural Code (§1209). The parties contracted for the

sale of fruit in a certain condition. Further, all applicable laws in existence at the time the contract is made become a part thereof as fully as if incorporated by reference. (Civ. Code, § 1656; 6 Cal.Jur. 311, § 186; *Calpetro P. Syndicate* v. *C. M. Woods Co.,* 206 Cal. 246 [274 P. 65]). The parties then intended, because it is so provided in the Agricultural Code, that title should pass when the fruit was delivered. This is the time the sale took place, *not* when the contract to sell was entered into. The contract was breached with respect to the quality of the fruit which was to be delivered. As I have previously pointed out, the Legislature has specifically provided that the parties may contract for liquidated damages to be paid to the association upon *any* breach by a member regarding the sale of products. The parties did so contract and the breach occurred, but the majority of this court refuse to allow that contract to be enforced. I cannot agree with a result which ignores not only the intent of the parties as expressed in their contract, but which also ignores the clear provisions of the Agricultural Code.

In the absence of statute in this state, it was well established that a nonprofit cooperative marketing association might contract for the payment by a member of liquidated damages for the violation of his agreement to deliver his product to the association for processing and marketing. (*California etc. Ass'n.* v. *Rindge L. & N. Co.,* 199 Cal. 168 [248 P. 658, 47 A.L.R. 904]; *Poultry Producers of So. Cal.* v. *Barlow,* 189 Cal. 278 [208 P. 93]; *Anaheim C. F. Ass'n.* v. *Yeoman,* 51 Cal.App. 759 [197 P. 959].) The validity of liquidated damage provisions in situations involving cooperatives was established because of the need on the part of these associations to control the quantity of the particular commodity involved. As was said in the Anaheim case, decided before the enactment of the present code sections: "The existence and life of the association itself depended upon its being furnished fruit to dispose of in the public market. A reduction in the amount of fruit so handled would not only tend to increase the overhead cost to the nontransgressing members, but, we may assume, to some extent affect the prestige and standing of the association as a marketing concern." (51 Cal.App. 759, 763.) These words are equally applicable to a situation such as the one here under consideration. The quality of the produce to be marketed may be of vital importance to the prestige of the association, and one does not need a vivid imagination to anticipate such situations. In the

present case, the association and its members had agreed between themselves that fruit of a certain quality should be delivered. The association had contracted with the government of the United States that fruit of a certain moisture content should be packed and delivered. As a result of the derelictions of certain members, the association was unable to meet its government contracts and the raisins in question were sold, unprocessed, to others. That the association and the members considered the quality of the raisins important is evident from the terms of the marketing agreement. It is equally evident that the prestige and standing of a marketing association may suffer as well from not being able to meet its contracts because of the poor quality of the produce as from a deficiency in quantity. *It is to be noted here that the poor quality of the raisins prevented them from being packed and thus the result was precisely the same as if the defaulting growers had not delivered all the raisins produced by them.* That the unprocessed raisins were subsequently sold to others is immaterial with respect to the standing and prestige of the association. The fact remains that it, admittedly, could not meet its contracts with the government for processed raisins. It is thus apparent that the association was injured by the breach of the marketing contract.

The defendants next contend that the words "properly cured and in good condition" were ambiguous; and that although the raisins in question were delivered during the latter months of the year 1944, the chemical tests, showing the excessive water content of the raisins, were not made until January, 1945. Oral evidence is admissible to show the meaning of a term in a particular trade or business in order to enable the court to interpret the writing. This oral evidence is not received to vary or contradict the writing but to explain it. (*Ermolieff* v. *R. K. O. Radio Pictures*, 19 Cal.2d 543 [122 P.2d 3]; *California C. P. Growers* v. *Williams*, 11 Cal.2d 221 [78 P.2d 1154]; *Body-Steffner Co.* v. *Flotill Products*, 63 Cal.App.2d 555 [147 P.2d 84].) In the Ermolieff case this court said (p. 550): "The basis of this rule is that to accomplish a purpose of paramount importance in interpretation of documents, namely, to ascertain the true intent of the parties, it may well be said that the usage evidence does not alter the contract of the parties, but on the contrary gives the effect to the words there used as intended by the parties. The usage becomes a part of the contract in aid of its correct interpretation." It is apparent from the record

that all the growers had been in the business for many years, and were well aware of the fact that raisins properly cured and in good condition were raisins that would go through the "stemmer," a machine used preparatory to packing the fruit. That these raisins would not go through the "stemmer" and were necessarily stacked inside and out of the packing house is, in itself, evidence that the raisins were not delivered in accordance with the agreement. With respect to the raisins delivered by defendant J. H. Scheidt, there was testimony to the effect that he had admitted that his raisins were too "wet" and that he had got "more [money] than was coming to me" for them. Section 1870 (2) of the Code of Civil Procedure provides that: "The act, declaration, or omission of a party" is evidence against such party. "The rule is settled beyond all controversy that the admissions or declarations of a party to a suit are admissible as evidence against the party making them. When given in evidence, they tend, as does other competent evidence, to prove the fact in issue to which they relate." (*Hall* v. *Bark "Emily Banning,"* 33 Cal. 522, 524.) (*Gates* v. *Pendleton,* 71 Cal.App. 752 [236 P. 365]; *Langensand* v. *Obert,* 129 Cal.App. 214 [18 P.2d 725].)

The contention is made that the trial court restricted the defendants' right of cross-examination of one of plaintiffs' witnesses, and refused the admission of other evidence. The evidence sought to be introduced in the cross-examination was with respect to the custom of packing houses, other than the one here under consideration, of stacking the boxes of raisins until they were sufficiently dried out to run through the "stemmer." The objection was made and sustained that this custom was immaterial to the issue involved—whether these particular raisins were delivered in conformity with the provisions of the marketing agreement. The excluded evidence consisted of a reiteration of testimony given before the arbitrators as to the condition of the raisins of one of the other growers. The trial court ruled that this had been concluded by the report of the arbitrators. But conceding, without deciding that this was not a proper ground for such ruling, it seems clear that the custom of other packing houses could not have been material to the present case since the issue at hand was whether or not the defendants had breached their agreement with the association. While facts concerning conditions at places other than those concerned in the case on trial may be admissible in evidence as bearing upon the

issues of a case, in order to render such evidence admissible it must be shown that such conditions are substantially the same as that concerned in the instant case. There was no showing here nor offer to show that the other packing houses were similar with respect to lack of drying facilities, or that the marketing agreements were the same.

The defendants maintain that even if the raisins were not delivered in conformity with the contract they were accepted by the association, and that as a result the provision with respect to the quality of the raisins was waived. The record shows that as the defective raisins were brought in by the growers, Chris H. Scheidt complained that they were too wet to pack, and reported their condition to the secretary-manager, and the president of the association who, in turn, reported to the board of directors. Chris H. Scheidt had no authority to do more than report the derelictions to the directors. He was under no obligation to reject the raisins delivered by the members. Under his contract with the association he was bound only to pack the raisins as they were delivered to him by the growers. His acceptance of the defective raisins could not have bound the association, and cannot be considered a waiver on its part to the terms of the marketing agreement.

Three of the five directors of the association were among those members who delivered the defective raisins to the association. When notice was given of the defective quality of the raisins and of the resultant breach of the marketing agreement, it became their duty to enforce the terms of the contract. By not doing so, they obtained an advantage for themselves and the other defaulting members of the association. Directors of a cooperative hold the property and property rights of the members thereof as trustees. (*Bogardus* v. *Santa Ana W. G. Ass'n.*, 41 Cal.App.2d 939 [108 P.2d 52]; *San Joaquin V. P. Producers' Ass'n.* v. *Commissioner of Int. Rev.*, 136 F.2d 382, 385; *Texas Certified Cottonseed Breeders' Ass'n.* v. *Aldridge*, 122 Tex. 464 [61 S.W.2d 79]; *Bowles* v. *Inland Empire Dairy Ass'n.*, 53 F.Supp. 210, 214, 215.) The directors, knowing of their own defective deliveries, and the deliveries of the other defaulting members were bound to compel compliance with the marketing agreements and to pay damages themselves and to enforce the liquidated damage provisions of the agreement. Further, by the terms of the by-laws they were required to withhold payments to any member indebted to the association, so that the lien of the association on monies due it by

a member would be safeguarded. In not so doing, they were guilty of a breach of trust with respect to the association and the other members. As such trustees, they were bound to act with the utmost good faith. (*Churchill* v. *Peters,* 57 Cal.App. 2d 521 [134 P.2d 841]; *Estate of Brown,* 22 Cal.App.2d 480 [71 P.2d 345]; *Overell* v. *Overell,* 78 Cal.App. 251 [248 P. 310].)

The trial court correctly found that it was not necessary that plaintiffs make a demand on the directors that the terms of the marketing agreement be enforced because such demand would have been futile as three of the five directors were among the defaulting members. The law does not require the doing of a futile act. (*Smith* v. *Dorn,* 96 Cal. 73 [30 P. 1024]; *Koshaba* v. *Koshaba,* 56 Cal.App.2d 302 [132 P.2d 854]; 6A Cal.Jur. 810-812, and cases there cited.) In *Smith* v. *Dorn, supra,* page 79, the court said: "Besides, the answer of the corporation shows that any demand upon it or upon its controlling directors for the remedy sought by this action, or any remedy for the wrongs alleged, would have been useless. Therefore, no such demand was necessary." (*Ashton* v. *Dashaway Association,* 84 Cal. 61 [22 P. 660, 23 P. 1091, 7 L.R.A. 809]; *Moyle* v. *Lander's Adm'rs.,* 83 Cal. 579 [23 P. 798]; *Parrott* v. *Byers,* 40 Cal. 614.)

The point is made by the defendants that one of the plaintiffs, Chris H. Scheidt, does not come into equity with "clean hands" in that he refused to let the defaulting growers retake their raisins for further drying, and that it was his duty to do so in order to mitigate damages. An examination of the record shows that the evidence was conflicting as to whether the growers tried to retake the raisins for further drying, and with respect to whether they intended to return them to Chris H. Scheidt for packing thereafter. It was the province of the trial court to resolve this conflict, and it is to be presumed that the trial judge reconciled and accounted for, to his own satisfaction, any and all inconsistencies which might be made to appear in the testimony.

There is no merit in defendants' contention that the judgment for attorneys' fees and the appointment of a receiver was erroneous. "It is a well-established doctrine of equity jurisprudence that where a common fund exists to which a number of persons are entitled and in their interest successful litigation is maintained for its preservation and protection, an allowance of counsel fees may properly be made from such fund. By this means *all* of the beneficiaries of the fund pay

their share of the expense necessary to make it available to them.'' (Emphasis added.) (*Winslow* v. *Harold G. Ferguson Corp.*, 25 Cal.2d 274, 277 [153 P.2d 714].) And a court of equity has inherent power to appoint a receiver at the request of stockholders on grounds of fraud or mismanagement. (*Koshaba* v. *Koshaba, supra.*)

For the foregoing reasons, I would affirm the judgment.

TRAYNOR, J., and SCHAUER, J.—We concur in the conclusion reached by Justice Carter and generally in the grounds stated therefor.

Respondents' petition for a rehearing was denied April 21, 1949. Carter, J., Traynor, J., and Schauer, J., voted for a rehearing.