[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12092

_____

D.C. Docket No. 7:15-cv-00121-WLS

AUTAUGA QUALITY COTTON ASSOCIATION,

Plaintiff - Appellant,

versus

TIM L. CROSBY,
MARISA D. CROSBY,
BRANDON CROSBY,
SKYLER CROSBY,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 25, 2018)

Before NEWSOM, BRANCH, and ANDERSON, Circuit Judges.

NEWSOM, Circuit Judge:

This is a case about cotton.  B. B. King once called cotton "a force of nature"—"[t]here's a poetry to it," he wrote, "hoeing and growing cotton."[1]  Here, the poetry of the hoeing and growing has given way to a nasty little feud over the selling.  Specifically, Autauga Quality Cotton Association, a cooperative that pools and markets farmers' cotton, claims that the individual owners of one of its former member entities—together, the Crosbys—breached a marketing agreement, and "betray[ed]" the organization, when they failed to deliver their promised cotton for the 2010 crop year.  Most significantly for present purposes, Autauga contends that as a remedy for the Crosbys' breach it is entitled to liquidated damages pursuant to the marketing agreement's terms.  We must determine whether, under Alabama law, the provision that Autauga seeks to enforce is a valid liquidated-damages clause or, instead, an impermissible penalty.  We hold that the provision imposes a penalty and is therefore void and unenforceable.

# I

## A

Appellant Autauga is a not-for-profit cotton-marketing association based in Central Alabama.  Its mission is to provide price stability to both farmers and consumers by pooling the cotton grown by its more than 1,000 members and then marketing it for sale.  Association members pledge all of the cotton that they grow

---

[1] B. B. King with David Ritz, *Blues All Around Me* 57 (HarperCollins 1996).

2

on certain farms to Autauga, which then, based on the members' representations, sells both commodity futures and physical product to consumers.  After the cotton is harvested and ginned, Autauga delivers it to the buyers and remits the sale proceeds (minus its own operating expenses) to its members.  This arrangement is memorialized in a marketing agreement between Autauga and each association member.

Appellees are a family of South-Georgia cotton farmers and partners in Crosby, Crosby, Crosby, Crosby (CCCC).  Before the kerfuffle that resulted in this litigation, CCCC had been a member of (and sold a lot of cotton through) Autauga for many years.

In their capacities as partners in CCCC, Tim and Marisa Crosby entered into the operative marketing agreement with Autauga in 2007.  Their children, Skyler and Brandon Crosby, joined CCCC—and the marketing agreement—the following year.  Under the agreement's terms, CCCC was obligated to sell to Autauga all cotton grown on farms listed on a separately-executed "Farm Verification Form." (Association members are free to sell cotton grown on farms not listed on the verification form outside Autauga's marketing pool.)  The agreement contemplated that CCCC would submit a new verification form each year, but didn't specify a deadline for doing so.  Importantly, per the agreement's language, the previous year's verification form would continue to apply until a new form was filed.  In

3

2009—the year before the crop year in question here—CCCC (through an intermediary) submitted its verification form in late October. In that form, CCCC pledged to market through Autauga all cotton grown on more than 2,000 acres of land spread across 22 farms. (For the 2009 crop year, CCCC's pledge resulted in it marketing more than 4,000 bales through Autauga.) Because CCCC never submitted a verification form for the 2010 crop year, its 2009 form governed its 2010-crop-year obligations.

The agreement allows a grower to "sign out" of the marketing arrangement entirely by executing a certified notice by a particular date before the beginning of the crop year.[2] On March 8, 2010, Autauga informed its members that the "sign-out" deadline for the 2010 crop year would be March 26. It's undisputed that the Crosbys never executed a "sign-out" notice, although, as it turns out, Tim Crosby had earlier executed contracts to sell essentially all of CCCC's 2010-crop-year cotton—some 4,000 bales—to an organization outside the association, Cargill Cotton.

On April 8 and August 24, 2010, Autauga sent letters to its members requesting that they submit farm verification forms as soon as possible, but didn't specify a hard deadline. When it still hadn't received CCCC's verification form by November 2010, Autauga contacted Tim Crosby by phone, and Tim reported that

---

[2] The parties agree that the "sign-out" notice and the farm verification form are "separate and distinct concept[s]" under the agreement.

4

CCCC would be selling most if its 2010-crop-year cotton directly to Cargill.  By December, CCCC had delivered more than 4,000 bales of 2010 cotton to Cargill. CCCC never delivered any of its pledged 2010 cotton to Autauga.

In May 2011, Autauga's attorney sent a demand letter to CCCC explaining that the Crosbys' failure to deliver the cotton pledged in their 2009 verification form breached the marketing agreement[3] and that, as a result, Autauga was entitled to liquidated damages.  In relevant part, the agreement's liquidated-damages provision provides as follows:

> In the event of a breach by the Grower of any material provision of this Marketing Agreement, particularly as to the delivery or marketing of committed cotton other than through the Association, the Association shall, upon proper action instituted by it, be entitled to an injunction to prevent further breach and to a decree for specific performance hereof, according to the terms of this Agreement.  If and to the extent that the equitable relief described above is not available,[4] the Association shall be entitled to receive for every breach of this agreement for which such equitable relief is unavailable, liquidated damages in an amount equal to the difference between (a) the price of such cotton on the New York futures market during the period beginning with the date of breach or default by the Grower (taking into account the grade, staple, and micronaire of such cotton) and ending with the final delivery by the Association of cotton sold during that year, and (b) the highest price per pound received by the Association for the membership cotton (of the same or nearest grade, staple, and micronaire) sold by it from the same year's crop.

The May 2011 letter didn't demand a specific liquidated-damages sum;

---

[3] Although the Crosbys continue to dispute that they breached the agreement, they acknowledge that breach is not an issue on appeal.  *See* Oral Arg. Tr. at 23:02.

[4] In its complaint, Autauga asserted that "[e]quitable or injunctive relief in this case is not available [because CCCC] already sold the pledged cotton on the open market."

5

rather, it stated that Autauga hoped to avoid a lawsuit and urged CCCC to "take prompt action to resolve this matter in a way that satisfies [Autauga]."  Nearly three years later, Autauga's attorney sent a second letter that, for the first time—and purporting to use the formula set out in the agreement—calculated the liquidated damages to be $1,305,397.  The second letter included an offer to settle for less if the Crosbys paid within 30 days; otherwise, it said, Autauga would be "forced to initiate a lawsuit."

## B

The Crosbys didn't pay, and Autauga sued.  Claiming that the Crosbys had breached the marketing agreement by failing to deliver their pledged cotton for the 2010 crop year, Autauga asserted that it was entitled to liquidated damages. Having initially calculated the liquidated-damages sum to be $1,305,397, Autauga increased the amount to $1,340,225 when it filed its complaint—and then later revised it upward to $1,660,857, and then upward again to $1,712,846, and then downward to $1,696,610.  Following discovery, the Crosbys sought summary judgment on the ground that the agreement's liquidated-damages provision is an unenforceable "penalty" clause under Alabama law.[5]  The district court agreed and granted summary judgment, concluding that the provision imposes a

---

[5] The agreement's "Controlling Law" provision states that it is "to be governed by the law of the State of Alabama" and that its terms and provisions "shall be construed and interpreted in accordance with the laws of the State of Alabama."

6

penalty—rather than reasonably estimating probable loss—and is therefore void. Autauga timely appealed to this Court.

## II

On appeal, Autauga asserts that the agreement's liquidated-damages provision is enforceable for three reasons: (1) because it isn't a penalty clause under the usual common-law rules prevailing in Alabama; (2) because the usual rules should bend to a public policy that demands "liberal enforcement" of liquidated-damages provisions in cooperative agreements; and (3) because, usual rules aside, Alabama's Agricultural Code explicitly authorizes liquidated-damages clauses in mutual farming associations' marketing contracts. We consider Autauga's arguments in turn.[6]

## A

The general common-law rules regarding liquidated damages are well-settled. Under Alabama law, bona fide liquidated-damages provisions—which prescribe "a sum to be paid in lieu of performance"—are enforceable, but "penalty" clauses—which impose "a security for the performance of the agreement or … a punishment for default"—are void. *Camelot Music, Inc. v. Marx Realty & Imp. Co.*, 514 So. 2d 987, 990 (Ala. 1987). The trick, of course, is distinguishing

---

[6] We review a district court's order granting summary judgment *de novo*, taking all the evidence, and drawing all reasonable inferences, in favor of the non-moving party. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005).

between the two.  Helpfully, Alabama courts have identified three essential markers of a valid liquidated-damages provision: "First, the injury caused by the breach must be difficult or impossible to accurately estimate; second, the parties must intend to provide for damages rather than for a penalty; and, third, the sum stipulated must be a reasonable pre-breach [estimate] of the probable loss."  *Id.*  If any one of these three criteria isn't satisfied, "the clause must fail as a penalty." *Milton Const. Co. v. State Highway Dep't*, 568 So. 2d 784, 790 (Ala. 1990), *overruled on other grounds by Ex parte Alabama Dep't of Transp.*, 978 So. 2d 17, 23 (Ala. 2007).

The marketing agreement here prescribes the following liquidated-damages formula:

> [T]he difference between (a) the price of [the pledged but undelivered] cotton on the New York futures market during the period beginning with the date of breach or default by the Grower (taking into account the grade, staple, and micronaire of such cotton) and ending with the final delivery by the Association of cotton sold during that year, and (b) the highest price per pound received by the Association for the membership cotton (of the same or nearest grade, staple, and micronaire) sold by it from the same year's crop.

The Crosbys insist that the formula can't survive *Camelot*'s three-part test.  They attack the formula as unreasonable and punitive, criticizing its ambiguity and the grossly disproportionate results that it produces.  We agree.  Faithful application of *Camelot* requires us to conclude that the provision at issue here is an unenforceable penalty rather than a valid liquidated-damages clause.

8

**1**

To begin, *Camelot*'s first prong is easily satisfied—the injury caused by the Crosbys' alleged breach *is* "difficult or impossible to accurately estimate." 514 So. 2d at 990. Indeed, although Autauga devotes the bulk of its briefing to arguing prong one, the Crosbys don't even dispute that it is met. The problem for Autauga isn't prong one, but rather prongs two and three.

**2**

*Camelot*'s second prong—whether the parties "intend[ed] to provide for damages rather than for a penalty," *id.*—weighs heavily against enforceability. We find two pieces of evidence particularly indicative of an intent to penalize rather than to compensate.

First, there is the text of the agreement itself. As a benchmark for measuring damages—*i.e.*, as the top number in what amounts to a subtraction equation—the liquidated-damages provision's formula uses the "highest price per pound received" by Autauga for cotton at any time during the relevant crop year, no matter how small the amount. That "highest price" factor certainly doesn't evidence an intent to reasonably estimate Autauga's actual loss. Indeed, so far as we can tell, it bears no necessary (or even probable) relationship to actual loss, or to the real world more generally. Why the "highest price," as opposed to the "average," "median," or even "lowest"? That question seems to us to answer

9

itself—in order to pump up the prescribed damages and thereby maximally deter breaches of the agreement.

Second, Autauga's own damages expert confirmed what the agreement itself indicates when he repeatedly testified during his deposition—both on direct and on cross—that the liquidated-damages provision's formula was intended not to estimate actual loss, but rather to discourage breach. Asked point-blank initially, "What purpose does th[e] formula serve?" he answered, three separate times, "there's a disincentive for a farmer … to not perform and not deliver his cotton," "it's a disincentive to not perform, to breach the contract," and "it's a disincentive for anybody to breach the contract." Deposition of John Mitchell at 200–02. When asked later if he wanted to clarify or add any nuance, Autauga's expert doubled down:

> Q: "I know you said that this formula is supposed to be a disincentive. But is it also supposed to approximate some loss to Autauga Quality Cotton Association?"
>
> A: "Yeah. I wouldn't agree with that. I would say it should have some attempt toward making Autauga whole, but I don't know that it is trying to approximate actual loss."

*Id.* at 272. Finally, asked by Autauga's own lawyer, the expert reiterated that the liquidated-damages provision is "not a make-Autauga-whole" remedy, but rather a "disincentive for a farmer to not perform." *Id.* at 397.

The evidence thus strongly indicates that the agreement's liquidated-

10

damages provision was designed to deter breaches, not to estimate and compensate losses.  Under longstanding Alabama law, a provision that is intended to serve as a disincentive to breach or a security for performance is void as a penalty.  *Milton*, 568 So. 2d at 791.  Accordingly, the formula fails *Camelot*'s second factor.

**3**

The formula also fails the third *Camelot* criterion because "the sum stipulated" isn't "a reasonable pre-breach [estimate] of the probable loss."  514 So. 2d at 990.

As an initial matter, the liquidated-damages provision is fatally ambiguous. From the "highest price" benchmark—just discussed—the formula subtracts "the price of [the promised but undelivered] cotton on the New York futures market during the period beginning with the date of breach or default by the Grower … and ending with the final delivery by the Association of cotton sold during that year."  In at least two respects, this latter factor—*i.e.*, the bottom number in the equation—is so vague as to amount to an ink blot.  For starters, *what* "price of []" cotton on the New York futures market"?  That price—like the price of any commodity—will fluctuate constantly, even throughout an individual trading day. There is no single, identifiable "price."  To paper over that conspicuous difficulty, Autauga assumes that the formula should be understood to refer to the *average* price during the specified period; on that assumption, Autauga says, the formula

11

works just fine.  The problem is that the word "average" appears nowhere in the provision, and Autauga has offered no convincing explanation why we should engraft the term "average"―as opposed to some other measure of value, such as median―onto the provision's plain language.  To make matters worse, although the formula requires that the "price" be determined, in part, by reference to the "date of breach," it never defines that term—and perhaps not surprisingly, in offering a wide variety of damages calculations, *see supra* at 6, Autauga has used as many as *eight* different breach dates, each presumably tied to some different alleged act or omission of CCCC.  A formula plagued with such pervasive ambiguity doesn't—and can't—provide a reasonable pre-breach estimate of probable loss.

Finally, and separately, as explained by the Alabama Supreme Court in *Milton*, *Camelot*'s third prong requires a hindsight comparison of actual harm to the damages prescribed by the contract.  568 So. 2d at 791.  In this case, that comparison yields a grossly disproportionate number.  Autauga is a non-profit association that recoups only its operating and marketing expenses before distributing earnings to its members.  Here, the Crosbys (as members of the association) would have received the bulk of any sales revenue from their cotton.  But the liquidated-damages sum that Autauga is seeking―now calculated to be $1,696,610―is more than 80% of the total sales value of CCCC's entire 2010 crop

12

($2,092,015.89) and nearly three times CCCC's 2010 net earnings ($592,015.89). The liquidated-damages figure vastly exceeds anything that Autauga could even possibly have lost as a result of the Crosbys' alleged breach. *See Southpace Properties, Inc. v. Acquisition Group*, 5 F.3d 500, 505–06 (11th Cir. 1993) (invalidating a liquidated-damages clause under Alabama law after determining, following hindsight review, that the damages were disproportionate and unreasonable).

Because the agreement's liquidated-damages formula doesn't remotely prescribe a "reasonable pre-breach [estimate] of the probable loss," *Camelot*, 514 So. 2d at 990, it fails *Camelot*'s third criterion.

\*  \*  \*

Put simply, there's just no evidence that the liquidated-damages formula here bears any relation to Autauga's probable loss. By contrast, the contractual language, Autauga's own expert's testimony, and the grossly disproportionate sum that Autauga claims combine to demonstrate that the agreement's liquidated-damages provision was intended as "a security for the performance of the agreement or as a punishment for default"—precisely what Alabama courts have forbidden. *Id*. Accordingly, under the usual common-law rules, the liquidated-damages clause is a void and unenforceable penalty.

13

**B**

Not so fast, Autauga says—the usual common-law rules, it asserts, don't (or shouldn't) apply to cooperative marketing associations. Instead, Autauga contends—cobbling together cases and commentary spanning nearly a century—liquidated-damages provisions in cooperative marketing agreements are entitled to "liberal enforcement" due to the unique qualities of cooperative organizations. The success (and even survival) of these associations depends on every member's compliance, Autauga emphasizes—which, the argument goes, has led courts to adopt a more permissive attitude toward liquidated-damages clauses in cooperative marketing contracts. When "properly" construed under this "policy of liberal enforcement," Autauga says, the liquidated-damages provision here is reasonable and valid.

The problem is that, upon inspection, the authorities that Autauga cites provide no meaningful support for its liberal-enforcement argument. Among Alabama cases, Autauga primarily relies on *Ex parte Baldwin Cty. Producers' Corp.*, 83 So. 69 (Ala. 1919), and *Warren v. Alabama Farm Bureau Cotton Ass'n*, 104 So. 264 (Ala. 1925). But those decisions are doubly irrelevant here. First, neither involved liquidated damages; *Baldwin* held that a provision in a marketing association's bylaws requiring members to pay 3% of their gross sales to the cooperative didn't impermissibly "restrain[] trade," 83 So. at 71, and *Warren*

14

similarly held that a specific-performance provision in a marketing agreement didn't "restrain[] trade," 104 So. at 268–69.  Second, the provisions at issue in both cases—the gross-receipts clause in *Baldwin* and the specific-performance clause in *Warren*—were expressly authorized by state statute, which, as explained in detail below, the liquidated-damages provision in Autauga's marketing agreement isn't. *See Baldwin*, 83 So. at 71; *Warren*, 104 So. at 267.

Presumably in an effort to pad its conspicuously thin Alabama-based authority, Autauga turns to cases from other jurisdictions.  But those cases, too— even if we were inclined to look beyond Alabama's borders to make an *Erie*-guess about the content and meaning of Alabama law—are likewise distinguishable. *Olson v. Biola Co-op. Raisin Growers Ass'n*, 204 P.2d 10 (Cal. 1949), and *United Dairymen of Arizona v. Rawlings*, 177 P.3d 334 (Ariz. Ct. App. 2008), for instance, both involved statutes that explicitly authorized liquidated-damages provisions in cooperative marketing agreements.  *See Olson*, 204 P.2d at 13 (stating that "an important [statutory] exception to the general rule on the remedy of liquidated damages prevails in the case of a nonprofit cooperative marketing association"); *United Dairymen*, 177 P.3d at 340 (concluding that a liquidated-damages provision was *per se* enforceable based on statutory language providing that such provisions "shall be" enforced).  *Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 592 S.W.2d 340 (Tex. 1979), is likewise off-point.  There, the

15

Supreme Court of Texas held only that a cooperative-marketing-association statute, which provided that an association's bylaws may fix liquidated damages, didn't prohibit the association's general right to contract for such damages in the absence of the bylaws' express authorization. 592 S.W.2d at 342–43. Although the court noted the importance of liquidated-damages provisions in cooperative marketing agreements, it also (and importantly) indicated that the usual common-law rules governed enforceability, even of provisions expressly permitted by statute. *Id.* at 342 n.2.

In short, none of the authorities that Autauga has mustered in support of its "liberal enforcement" argument provides any firm basis for disregarding (or diluting) Alabama's general common-law rules.

## C

Finally, Autauga asserts that it is entitled to avail itself of an Alabama statute—Ala. Code § 2-10-65—that seems to broadly authorize at least some marketing associations to enforce liquidated-damages provisions. Autauga is wrong. Its argument is belied by the Alabama Code's clear text and structure.

Chapter 10 of Alabama's Agricultural Code, *see* Ala. Code § 2-10-1 *et seq*., establishes rules and regulations governing marketing cooperatives and associations. As the Alabama Supreme Court has explained, Chapter 10 comprises four articles, "which are as follows: Article 1, General Provisions (§2-10-1);

16

Article 2, Marketing Associations Generally (§§ 2-10-20 through 2-10-35); Article 3, Incorporated Marketing Associations (§§ 2-10-50 through 2-10-74); and Article 4, Mutual Farming or Trucking Associations (§§ 2-10-90 through 2-10-108)." *Flav-O-Rich, Inc. v. City of Birmingham*, 476 So. 2d 46, 49 (Ala. 1985). Articles 1 and 2, the Court said, "are intended to apply to all cooperatives and associations formed under any of these sections." *Id.* By contrast, "Articles 3 and 4 set forth separate and distinct schemes for the formation of cooperatives and associations." *Id.*

Section 2-10-65—contained in Article 3—expressly authorizes the marketing associations to which it applies to execute contracts "fix[ing], as liquidated damages, specified sums to be paid by the member … to the association upon the breach by him of any provision of the marketing contract regarding the sale or delivery or withholding of products" and, further, broadly states that "any such provisions shall be valid and enforceable in the courts of this state." Ala. Code § 2-10-65. Notably—and significantly here—Article 4 doesn't include a comparable provision.

Autauga asserts that even though it was organized under Article 4—its marketing agreement expressly states that it is "a cooperative association for mutual farming and trucking organized under Title 2-10-90 *et seq*., Code of Alabama 1975"—it should nonetheless enjoy the protection of Article 3's Section

17

2-10-65.  No way.  Autauga's argument is foreclosed by plain statutory text.  By its terms, Section 2-10-65 authorizes "association[s]" to enforce contractual liquidated-damages provisions.  And critically, Section 2-10-50—which is also contained in Article 3—defines the term "association" to mean "[a]ny corporation organized under *this article*."  Ala. Code § 2-10-50 (emphasis added).  Because Autauga wasn't organized under "this article"―*i.e.*, Article 3―Section 2-10-65 doesn't apply to it.  Period, paragraph, end of story.  Under Alabama law, when "the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect."  *Ex Parte Ankrom*,152 So. 3d 397, 410 (Ala. 2013).

To be clear, Autauga *could* have elected to organize under Article 3 rather than Article 4.  But it didn't.  At oral argument, Autauga explained that it affirmatively chose Article 4 over Article 3 in order to take advantage of certain tax benefits available under the former.  *See* Oral Arg. Tr. at 26:51.  That's fine and all, but it underscores what the Alabama Supreme Court has said about Articles 3 and 4—namely, that they are "separate and distinct."[7]  *Flav-O-Rich*, 476

---

[7] As its sole case-law authority for the proposition that the boundary between Articles 3 and 4 can be disregarded, Autauga cites *State v. Franklin Cty. Co-op., Inc.*, 464 So. 2d 120 (Ala. Civ. App. 1985), in which an intermediate appellate court permitted an Article 3 association to obtain a licensing-fee exemption based on language in an Article 4 provision.  But the *Franklin* court never explained—at all—why the Article 4 provision applied.  The Alabama Supreme Court has warned that silence cannot "justifiably support judicial intrusion into legislative matters" and that "[a]rguments based on what courts do not say, logically speaking, are generally unreliable and should not be favored by the judiciary …."  *Ex parte James*, 836 So. 2d 813, 818 (Ala. 2002).

18

So. 2d at 49.  Life is full of choices.  In choosing Article 4 over Article 3 for its tax advantages, Autauga lost out on Article 3's liquidated-damages authorization.  Alas, Autauga must take the bitter with the sweet.

Autauga's assertion that Articles 3 and 4 should be read "*in pari materia*" can't overcome the clear statutory language and structure that are so dead-set against it.  In fact, when properly understood and applied, the *in pari materia* rule boomerangs back around to undermine Autauga's position.  Contrary to Autauga's contention, the *in pari materia* canon doesn't require a court to ignore (or render permeable) the boundaries between two separate but related statutes.  Rather, under Alabama law, "[w]here statutes are *in pari materia*"―meaning they "deal with the same subject," which Articles 3 and 4 undoubtedly do―"they should be construed together to ascertain the meaning and intent of each."  *League of Women Voters v. Renfro*, 290 So. 2d 167, 169 (Ala. 1974).  When Articles 3 and 4 are so construed, what jumps out, at least for purposes of this case, is their differing treatments of liquidated-damages provisions: Article 3 expressly authorizes their enforcement; Article 4 doesn't.  So, to the extent that there is any inference to be drawn from the sort of comparison that the *in pari materia* rule entails, it cuts decisively against Autauga's position.  *Cf., e.g.*, *Dees v. Coaker*, 51 So. 3d 323, 330 (Ala. Civ. App.

Moreover, and in any event, *Franklin*'s *ipse dixit* contradicts the Alabama Supreme Court's clear—and subsequent—statement that Articles 3 and 4 are "separate and distinct." *Flav-O-Rich*, 476 So. 2d at 49.

19

2009) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983), for the proposition that where a legislature "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion").

Finally, Autauga retreats to the quintessential last hope of lost causes— "public policy." Article 4 associations, it says, shouldn't be denied Section 2-10-65's protections because the policy behind enforcing liquidated-damages provisions is the same regardless of the legal form that the association takes. Whether or not that's true, Autauga's argument fails because it contravenes (as already explained) the clear statutory text and structure, as well as longstanding Alabama Supreme Court precedent emphasizing that "[t]he Legislature is endowed with the exclusive domain to formulate public policy in Alabama, a domain upon which the judiciary shall not trod." *Cavalier Mfg., Inc. v. Jackson,* 823 So. 2d 1237, 1248 (Ala. 2001), *overruled on other grounds by Ex parte Thicklin,* 824 So. 2d 723 (Ala. 2002); *see also Boles v. Parris,* 952 So. 2d 364, 367 (Ala. 2006) ("[I]t is well established that the legislature, and not this Court, has the exclusive domain to formulate public policy in Alabama."). Had the Legislature wanted Section 2-10-65 to apply to Article 4 associations, it could easily have said so. It's certainly not our place—particularly as a federal court sitting in diversity—to speculate

20

whether the Alabama Legislature might have secretly intended (or might even today prefer) a different rule.  If the Legislature thinks we've gotten it wrong, it is of course free to "enact appropriate legislation to modify the statute and yield a different result in subsequent cases." *Ex parte Jackson,* 614 So. 2d 405, 408 (Ala. 1993).  Okay by us.  But we "will not"—under Alabama law, cannot—"make such a modification for it." *Id*.

So Autauga's statutory argument fares no better than its common-law contentions.  Autauga attempts to add language where none exists and create conflict where none is present.  The statutory text and structure—as well as their implications for this case—are clear: Section 2-10-65 applies only to cooperatives organized under Article 3; Autauga wasn't organized under Article 3; ergo, Autauga can't avail itself of Section 2-10-65's protection.

### III

In the end, neither Autauga's "liberal-enforcement" argument nor its statutory argument allows it to evade application of Alabama's common law rules.  And under those rules, Autauga's liquidated-damages provision is plainly a penalty―rather than a reasonable estimate of probable loss―and is therefore void and unenforceable.[8]

---

[8] Because we find that no "substantial doubt exists about the answer" to the questions of Alabama law that this case presents, *Forgione v. Dennis Pirtle Agency, Inc*., 93 F.3d 758, 761

21

**AFFIRMED.**

---

(11th Cir. 1996) (per curiam), we decline Autauga's request that we certify those questions to the Alabama Supreme Court.